José J. Gómez, Plaintiff and Appellee, *v.* Lucila Trujillo, Defendant and Appellant.

No. 8240. Argued November 6, 1941.—Decided November 13, 1941.

*Dubón & Ochoteco,* and *Otero Suro & Otero Suro,* for appellant. *C. Iriarte, F. Fernández Cuyar, H. González Blanes,* and *F. Alvarado, Jr.,* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

This is a suit for divorce brought by the husband against his wife in which the district court decreed the dissolution of the marriage.

The husband alleged that his wife had deserted him ever since the middle of 1936 and, further, that she had offended him and treated him cruelly. The defendant denied both charges, and the case went to trial. Judge Berga, before whom the trial was held, died and the case was submitted for decision to Acting Judge J. A. González, who weighed the evidence as follows:

"We have carefully read all the evidence introduced by the parties, and after considering the testimony of the witnesses and especially that of the parties themselves, we are firmly convinced that the plaintiff is legally and morally right. The evidence as a whole shows the existence of an intolerable situation in the home which is mainly due to the unreasonable, violent, and quarrelsome temper of the defendant. The testimony of the latter and of her witnesses is for the most part little worthy of credit, in view of the improbability of the facts occurring in the way set forth in such testimony, although in many details the latter corroborates the definite statements of plaintiff's witnesses. From a serene, cool, and impartial reading of the evidence introduced, there strongly appears the clear and obvious fact of an unjustified charge of illicit relations between the plaintiff and the witness Elena Lewis. Although the whole theory of the defendant rests on such alleged relations, the evidence greatly lacks persuasive force and fails to convince us that said relations actually existed. For practical purposes, we may conclude that such charge is without foundation and is not sustained by the evidence.

"With the exception of the testimony of the defendant herself, given in such a way that we can not accord any credit to it, the facts brought out by the evidence for the plaintiff were not seriously refuted. The assault described in a desinterested, clear, and definite manner by policeman Angel Borrero, as having occurred on a public street, where the defendant slapped plaintiff in such an unusual and unjustifiable manner; the offensive, insulting, and injurious words uttered by defendant against the plaintiff in the presence of Luis Noble, who owns a mechanic shop in Fernández Juncos Avenue, and the fact of the plaintiff having had to jump out of a window of his own house in order to avoid the assault attempted by the defendant with a revolver, with the express intent to kill plaintiff, all of which was heard by said witness Noble; the assault committed also in public, near the "Puerto Rico" cinema, coupled also with offensive and insulting words, as testified to by the witness Domingo Rivera Rivera; the leaving of the home by defendant, carrying with her the children, to go to the house of Mrs. Caballero who testified also that said defendant had told her finally that she did not want to live again with plaintiff, that the latter went to fetch her and she told him again that she did not want to live any longer with him; all these facts, independently of those

established by the testimony of plaintiff himself, show a cruel treatment continuously inflicted by defendant on plaintiff and grave insults repeatedly uttered publicly as well as privately, even in the presence of their children. It is easy to explain the conduct of the plaintiff, who was compelled to go and live in the house of Mr. Fernández Abarca, even though he had a home of his own, to spare his children the sufferings caused by the conduct of the defendant.

"On the other hand, the evidence shows the plaintiff to be a reliable, earnest, and dutiful man. Not only does it appear from a specific allegation of the answer (special defense marked IV) that plaintiff has always paid for the support of defendant and her children and for all their other material needs, but it also appears from the evidence that the house where all the members of the family, save the plaintiff himself, live, belongs to the latter, and the plaintiff, moreover, used to pay to defendant and her children $20 weekly and afterwards $12 weekly. It further clearly appears, and this is logical and easy to believe, that the repeated acts of aggression, by words as well as by deeds, on the part of defendant against the plaintiff have affected the nervous system of the latter, with the result that his special work in the Abarca firm has been affected as the same requires calm and steady nerves. The evidence to the effect that the plaintiff has been compelled frequently to resort to the Auxilio Mutuo, a hospital, to be treated for his nerves, owing to the conduct of the defendant, has not been at all contradicted. We find in defendant's testimony a fact extremely significant which graphically illustrates the mental attitude of defendant. Referring to the plaintiff, she said: 'He is very necessary *for the support of my children.*' (Italics ours.) Indeed, such statement does not show the existence of the 'affectionate love always felt and still felt' by the defendant for the plaintiff, as alleged in her answer. The need had by the defendant for the plaintiff was only on account of the support of the children.

"We fully believe the testimony, obviously disinterested, of policeman Angel Borrero and that of Luis Noble, and we also believe plaintiff's testimony. In our opinion, the acts of aggression, the insults, the bad language and the offenses in public, in private, and in the presence of the children have been fully proved, as well as the fact that all of it was constantly repeated, and also its injurious effect upon the health of plaintiff and his efficiency in his work. We have no doubt whatever that the conduct of the parties towards each other is such as to make conjugal life intolerable, and especially that

most of the prejudice resulting from such an intolerable situation will fall upon the minor children."

He applied the law and the jurisprudence as follows:

"It has been held that systematic and continued use by the husband of vile, profane, and unkind language in the presence of and toward the wife, causing mental suffering and threatening permanent injury to her health, entitles her to a divorce. *Axtmayer v. Ortiz*, 19 P.R.R. 476. The husband is similary entitled under like circumstances. In the *Axtmayer* case, *supra*, our Supreme Court, in explaining the requisites of the evidence in similar cases, said:

" 'In determining generally what conduct on the part of either of the spouses constitutes cruelty, we must observe the provisions of the statutes and the circumstances of each particular case, always remembering the physical and mental conditions of the parties and their character and social status. The conduct between the parties should at least be shown to be such as render cohabitation intolerable; and though in some States actual bodily harm or apprehension thereof need not be shown, the treatment must have been such as to destroy the peace of mind and happiness of the injured party to such an extent as to endanger the health or utterly defeat the legitimate objects of the marriage.' (Pp. 478, 479.)

"No reasonable doubt can be entertained that, in view of the peculiar circumstances of the instant case, and taking into consideration the physical and moral conditions of both parties, as well as their social character and standing, defendant's conduct destroyed the peace of mind, the happiness, the efficiency, and even partly the health of the plaintiff. Although it is true that mere rudeness of language, bad temper, or harsh nature which fails to injure or break the health, is not sufficient to constitute the cruel treatment mentioned in subdivision 4 of Section 96 of our Civil Code (1930 ed.), such elements are not the only ones present in the case at bar, but also those above stated by us, and together they determine the cruel treatment and grave injury entitling the plaintiff to a divorce decree. It is not the case of offensive or insulting language uttered on a single separate occasion, coupled with the desertion shown by the evidence as a whole. *Figueroa* v. *Pierluisi*, 25 P.R.R. 460."

Feeling aggrieved by that judgment, the defendant appealed. In her brief she assigns two errors as having been committed by the trial court (1) in weighing the evidence,

474

and (2) in granting the divorce without any justifiable ground therefor.

■ As the judge who decided the case was not the one who conducted the trial, we are in the same position as the former for the purpose of considering and weighing the evidence. We hold differently. In our judgment the complaint should be dismissed on the merits.

■■ We think that it may be conceded as proven that one night in 1936, in Santurce, between the Olimpo Drugstore and the Paramount Theatre, on the sidewalk, policeman Angel Borrero saw that the defendant approached the plaintiff and while telling him that he ought to be at home, assaulted and battered him; that the policeman intervened and the plaintiff told him that the person involved was his wife whom he put in a car which was parked in front, and both went away; that one afternoon in the same year Luis Noble called at the house of the Gómez-Trujillo spouses, at the request of the husband, to repair his car and when Gómez asked his wife for the key she told him to search for it himself and called him a shameless scoundrel, and that Noble, not wishing to hear any more, went away; and that on another occasion while Noble was one night on the street he saw Gómez running away from his home and heard Mrs. Trujillo saying: "Stop there, I am going to kill you"; that on another night in 1936 Domingo Rivera, while standing in front of the Puerto Rico Cinema, saw Gómez by himself, leaning against the railing, when Mrs. Trujillo approached him and said: "What are you doing here, sluggard? Why don't you go home?"; that Rivera intervened and told Gómez not to pay any attention, and that several people witnessed the incident; that one night Lucila Trujillo and her four children went to the house of Sixta Caballero, as she had quarreled with her husband, and told her that she did not want to go on living with him; that Gómez went to fetch her, and that she stayed there four days at the end of which she returned to the house of her husband.

It may be conceded, further, that there is no evidence that the husband committed adultery and that it is a fact that husband and wife had lived apart for more than a year when the complaint was filed.

But if all those facts are examined in the light of what the evidence for the defendant shows, it must necessarily be concluded that there was no desertion of the husband by the wife and that, although the latter was guilty of unbecoming conduct on the occasions mentioned, such conduct was dictated by passion, under the excitement caused by the objectionable behavior of her husband in his dealings with another woman.

Let us first examine the alleged desertion. Answering questions asked by his own attorney, the husband testified at the trial as follows: "Do you say that you were expelled from your home? A.—Yes, Sir, .... That happened about the year 1936. My wife told me that if I did not leave, she was going to quit; she left a letter for me where she said .... she took the letter which she destroyed ... after leaving the note for me she left and went to Sixta Caballero .... I went and begged her to come, stating that I was going away, and she refused, saying that when she went I should not be in the house and I said to her, go and see how is the house that I will go away immediately' and I then spoke to Mr. Ramón Fernández who said to me, 'All right, come to my house ...' I used to give her $20 for support, afterwards I have been giving her $12."

What we shall presently transcribe from defendant's evidence—as we proceed to consider the other ground (cruel treatment and grave injuries) relied on—explains the attitude assumed by the plaintiff.

The first witness to take the stand was Elena Lewis, the husband's friend. She testified that she had known Gómez for a long time, he having been introduced to her by some friends on a visit to San Juan; that she did not know his

wife, nor did she know that he was married; that during three years they had gone out together several times.

She was shown a photograph which she recognized as a portrait of herself, explaining that she had mislaid it with others of her relatives kept in a bag which had disappeared from her home about a year before. She did not know whether the photograph was in the possession of Gómez.

The next witness was Angeles Gómez, a daughter of the Gómez–Trujillo spouses, who is a cashier in the "Bayamonesa" store. She testified that she was living with her mother and her four brothers. Her father had not lived with them for the last three years. He visited them frequently. During the first year he occasionally slept in the house.

On being asked to explain why her father did not live with them, she said: "My father had a friend . . . . And my mother did not like his going out so frequently with that friend and they started a discussion on that account; and one day mother went out with Mrs. Cestero . . . and father and mother returned, both shut themselves up in the room, and then mother came out and went with us into the parlor, and he beat her in our presence."

On the same night they went away to the house of Sixta Caballero. When they came back to their home, her parents went on living together, but as her father continued going out with his friend, quarrels always arose. "My father then left. Up to that time he had been a model father. He used to take us out. We went out with him. After he knew Elena Lewis there was no peace."

Trinidad Cestero testified that she had known the Gómez–Trujillo spouses ever since 1935, and she visited them. "They lived happily, a home that I envied . . . because they always went out together, and when this was not the case he would stay at home." This happiness did not last "because he (Gómez) was a great friend of my husband, they went out together, and one night he happened to meet (at El Nilo)

a lady friend who was introduced to him by my husband as his friend, Elena Lewis.

When Gómez left the house, she "called him and told him not to go away . . . because she (the wife) told her that he (Gómez) wanted to go away. She gave him some advice, reminding him that he had daughters who were young ladies, and he was needed in the home; that after so many years of happy life, she (the wife) loved him a great deal and suffered on account of his absence."

Referring to the night when the incident related by policeman Borrero occurred, she stated that she went out with Mrs. Gómez and another lady to Blanco Drugstore and that upon seeing Gómez' car his wife got into it and stayed there, while the witness went on with the other lady; and that afterwards she found the wife at home crying because Gómez had beaten her.

José Gómez, fourteen years old, a son of plaintiff and defendant, was the next witness. He testified that his father had not lived at his home for the last three years. The trial was held in 1939. He recognized a watch which his father had kept for many years and had presented to him. It had inside the back cover the photograph which Elena Lewis admitted to be her own portrait and which she said she had lost. He positively stated that his father used to beat his mother. He specifically referred to the night when his mother and they (the children) left the house, and said: "They came in from the street, my father and my mother, and shut themselves up in the room; after a while my mother came out running, and then I took the revolver to the house of Mrs. Cestero who kept it." It was his mother who gave him the revolver. In her testimony she explained the revolver incident as follows: "The revolver was in a closet and when I saw him open the closet I imagined that he was going to get and use it, and then I took the revolver from him, opened the door, and gave it to the child who ran out with it."

Rosalía Maysonet, a lady who lived in a house in front of that of the Gómez–Trujillo spouses, and who had been their friend for eleven years, testified that "they lived in harmony until three years ago when they disagreed." The disagreements arose "because he fell in love with this lady, Elena." She saw them together many times.

Lastly, Lucila Trujillo testified that she had been married to the plaintiff for twenty- three years and had four children and a foster child, "the eldest daughter is 19 years old; the second daughter, Josefina, is 17; the third child, José, 14; and the youngest, Gustavo, 12, and the foster daughter 17." They have lived at 13 Silva Street ever since 1928. They had previously lived eight years at Stop 15 and before that time in La Marina, in front of the Abarca Works. When she married her husband was working for Abarca as at present. He rented a room outside the house on June 13, 1936. He took his meals in the house during one year. Afterwards he left for good . . . . he seemed to be annoyed when I told him that I did not like to see him going about with this woman, Elena Lewis.

"Formerly his conduct was exemplary. Just imagine, if he was kind I had to be kinder."

When she heard of said relations, "I told my husband that I knew that he was going out with that woman and that he had promised to marry her, and then I told him that it seemed to me that we had been married for many years, that we had grown-up children who needed him . . . At first he would answer that I had everything, that he would continue being the same, that he was not deserting his home; but afterwards he said to me to mind my own business because he could do as he pleased and have all (the women) that he fancied."

In spite of all that had taken place, the defendant alleged in her answer and testified at the trial that she desired to have her husband back home because she still loved him.

The testimony is long and difficult to summarize. It is true that when examined by the attorney for the adverse party regarding the various incidents between her and her husband in the home and outside, she apparently eluded all responsibility and tended to belittle such incidents. She then doubtless hid a part of the truth, unnecessarily, in our judgment, because even considering such incidents at their worst, they do not reveal a cruel soul but one lacking control, impassioned, which, without any deliberate wickedness, goes beyond the proper limits, feeling desperate on account of the husband's behavior.

It can not be asserted, indeed, that the latter went so far as to commit adultery, but it may be concluded that his conduct was likely to create in his wife's mind the disturbances which it actually produced and, therefore, that he must suffer the consequences of his own acts rather than take advantage of them in order to destroy the home that he and his wife had set up.

The welfare of individuals and of society requires the preservation of the home. There are cases where that is an impossibility and the lawmaker himself has taken care to specify them. Among them are to be found those of desertion, cruel treatment and grave injuries; but desertion does not simply mean separation. It means the firm and deliberate will to desert. Cruel treatment and grave injuries only exist when they reveal a vicious and persistent purpose to hurt, to embitter; but not where the acts complained of spring from sudden passion.

In our judgment, as already stated by us, the action of divorce does not lie. There is no justifiable ground for granting the husband, over the objection of his wife, the relief sought by decreeing the dissolution of the matrimonial ties that bind him to her. His home is waiting for him. Let him behave as formerly and after the lapse of some years he will feel grateful towards the court which has refused to grant his petition.

480

His place is by the side of his helpmate who shared with him the hardships and sufferings when he began to work hard as a mechanic. His children are clamoring for his exemplary conduct which will be their best guide. Let not the prosperity that apparently led him into the acquisition of automobiles and into dangerous amusements and friendships continue to disturb his mind, and instead of completely involving him in its whirlwind, let it help him to consolidate his home, to strengthen it, and to prepare it for the time when the energy for work becomes exhausted.

The jurisprudence as to what constitutes desertion, or cruel treatment and grave injuries, warranting a divorce, is clear and definite. The very jurisprudence cited by the trial judge sustains the doctrine which we have applied. See also, as to desertion, the cases of *Moll* v. *Llompart,* 17 P.R.R. 666; *Arce* v. *Lebis,* 50 P.R.R. 857, and cases therein cited. As to cruel treatment and grave injuries, see those of *Fernández* v. *Hernández,* 8 P.R.R. 229; *Galip* v. *Drag,* 28 P.R.R. 767; *Figueroa* v. *Pierluisi,* 25 P.R.R. 460; and *Manich* v. *Quero,* 38 P.R.R. 83, and cases therein cited.

The appeal must be sustained and the judgment appealed from reversed, and another judgment rendered instead dismissing the action, with costs.